AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
THREE CELLULAR PHONES (ITEMS 1, 2, and 3)
LOCATED AND SECURED AT THE DEA WINCHESTER
RESIDENT OFFICE IN WINCHESTER, VIRGINIA

Case No. 5:23mj00077

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the __Western__ District of __Virginia__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 | Distribute and Possess with the intent to distribute controlled substance |

The application is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Jenna Sullivan
*Applicant's signature*

Jenna Sullivan, Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephone__ *(specify reliable electronic means)*.

Date: 11/6/23

*Judge's signature*

City and state: Charlottesville, Virginia

Joel C. Hoppe, United States Magistrate Judge
*Printed name and title*

The undersigned Assistant U.S. Attorney has reviewed the entire search warrant package and approves it

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THREE CELLULAR PHONES (ITEMS 1, 2, and 3) LOCATED AND SECURED AT THE DEA WINCHESTER RESIDENT OFFICE IN WINCHESTER, VIRGINIA | Case No. 5:23mj00077 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jenna C. Sullivan, being first duly sworn, do hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of certain electronic devices, more fully described below and in Attachment A, which is currently in law enforcement possession, and the extraction from this device of electronically stored information described more fully herein and in Attachment B.

2.  I am a Detective with the Loudoun County Sheriff's Office (LCSO,) Criminal Investigations, Special Operations Section, Leesburg, Virginia, and have been since 2015. I am currently assigned to the DEA High Intensity Drug Trafficking Task Force located in Reston, Virginia and have been since 2018. Prior to this assignment, I have been employed with the Loudoun County Sheriff's Office; Property Crimes Unit, Sex Crimes Unit; and the Special Operations Section, Tactical Enforcement Unit, since 2008.

3.  As a narcotics investigator, I have participated in the application for and execution of many State and Federal search warrants related to the investigation of narcotics and organized crime related offenses, resulting in the prosecution and conviction of many individuals

1

and the seizure of illegal drugs, drugs proceeds in the form of bulk U.S. currency, weapons, and other evidence of criminal activity. Additionally, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through training and experience, I am familiar with the methods used by traffickers of controlled substances and the nature and appearance of illegal narcotics. I have received extensive training in drug identification, drug distribution methods, and drug enforcement techniques from various federal, state, and local agencies.

4. Based on this experience, I have become knowledgeable of the methods and modes of narcotics operations and the language and patterns of drug abuse and trafficking. During the course of my participation in investigations of narcotics trafficking organizations I have testified at trial, grand jury proceedings, and preliminary hearings. During my employment with the Loudoun County Sheriff's Office and as a DEA Task Force Officer, I have gained knowledge in the use of various investigative techniques, including the utilization of wiretaps, physical surveillance, undercover agents, confidential informants, cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants. I am responsible specifically for the enforcement of the statutes of the Virginia Code pertaining to the possession and distribution of narcotics and controlled dangerous substances as well as federal drug trafficking laws under Title 21 of the United States Code. Furthermore, during my assignment with the DEA, I have investigated drug trafficking organizations (DTO) and Transnational Criminal Organizations (TCO) operating outside of the United States, specifically in Central and

South America. I have become abreast to many of the operational methods of those DTO's and TCO's, some of which includes, narcotics trafficking, bulk currency smuggling, trade routes, methods of concealment, bribery, acts of violence and operational tactics, all of which are used to further their criminal enterprise and import illegal narcotics into the United States.

5. The property to be searched is as follows:

   a. **Cellular phone marked as N-1 ("TARGET 1 CELL PHONE") belongs to CASTELLANO-QUINTANILLA**

   b. **Cellular phone marked as Item N-2 ("TARGET 2 CELL PHONE") belongs to PORTILLO AGULIAR**

   c. **Cellular phone marked as N-3 ("TARGET 3 CELL PHONE") belongs to GUARDADO FLORES**

## STATEMENT OF PROBABLE CAUSE

**A. Overview of Investigation**

6. As detailed below, law enforcement stopped and searched a vehicle operated and/or occupied by the defendants on or about October 5, 2023. Inside the vehicle, law enforcement discovered and seized approximately three kilograms ("KG") of cocaine and approximately .45 KG of marijuana (approximately one pound). During post-arrest and *Mirandized* interviews, the defendants acknowledged knowingly participating in the transport of the seized narcotics from Texas to Virginia. Prior to the traffic stop, law enforcement had been investigating one of the defendants based, in part, on information obtained from a confidential source ("CS").[1]

---

[1] Law enforcement has used the CS in connection with other investigations. Law enforcement has verified information provided by the CS on prior occasions and deemed such information credible based on drug seizures and other means. Law enforcement have not determined whether the CS has been entirely forthcoming about his or her role and relationship with the defendants. The CS has one or more pending criminal charges in the state court. The CS also has a misdemeanor conviction for possession of a fictious identification card. Law enforcement has also received information that the CS has been and may still be involved in drug trafficking activities.

7.      The CS previously advised law enforcement that one of the defendants traveled to Texas to obtain narcotics, which was consistent with statements later made by the defendants after their arrests in this matter. Additionally, a historical cell site search warrant for TARGET 1 CELL PHONE was obtained through a Loudoun County, Virginia Magistrate. The results of this search warrant showed that CASTELLANO-QUINTANILLA, previously traveled to Texas in July and August of 2023.

8.      The CS also stated that the CS knew CASTELLANO-QUINTANILLA was involved in distributing controlled substances since at least October 2022.

**B. Traffic Stop of Vehicle Occupied by the Defendants Results in Seizure of Approximately 3 KG of Cocaine and approximately .45 KG of Marijuana.**

9.      On or about October 5, 2023, law enforcement initiated a traffic stop after observing a vehicle driving north-bound on Interstate 81 with an expired registration. The traffic stop occurred in Shenandoah County, Virginia, which is located in the Western District of Virginia. GUARDADO FLORES was identified as the driver of the vehicle. Three other passengers were in the vehicle: CASTELLANO-QUINTANILLA, PORTILLO AGULIAR, and a minor female (herein, the "Minor"). CASTELLANO-QUINTANILLA was seated in the front passenger seat, PORTILLO AGULIAR was seated in the rear passenger seat behind the driver's seat, and the Minor was seated in the rear passenger seat behind the driver's seat.

10.     A law enforcement certified narcotic detection canine and certified narcotic detection canine handler were on the scene of the traffic stop. The handler deployed the canine to conduct an air sniff around the vehicle. The handler advised that the canine alerted to a narcotic odor coming from/about the vehicle.

4

11. After this canine alert, law enforcement searched the vehicle and located three cellular devices, cellular phone belonging to CASTELLANO- QUINTANILLA ("TARGET 1 CELL PHONE,") cellular phone belonging to PORTILLO AGULIAR ("TARGET 2 CELL PHONE,") and cellular phone belonging to GUARDADO FLORES ("TARGET 3 CELL PHONE.").

12. Law enforcement found three individually wrapped bricks of a compressed white powdery substance inside the vehicle with "GATO LG" written on each package, as well roughly one pound of packaged leafy green material suspected to be marijuana. The white powdery substance was field tested and tested positive for cocaine. Based on my training and experience, I know multi-kilogram quantities of cocaine are consistent with distribution – rather than personal use – quantities of the controlled substance. Further, I also know that a kilogram of cocaine is highly valuable and possesses a street value in the broader Northern Virginia area of approximately $35,000.

## Identification and Recovery of the Target Cell Phone

13. Law enforcement provided the defendants with their rights pursuant to *Miranda*, which they all elected to waive. The defendants participated in voluntary interviews with law enforcement and all acknowledged and admitted to participating in the transit and trafficking of cocaine.

14. During his interview, GUARDADO FLORES admitted that he knew CASTELLANO-QUINTANILLA sold cocaine and had asked him (GUARDADO FLORES) to accompany CASTELLANO-QUINTANILLA on a trip to Texas to purchase cocaine. In exchange, GUARDADO FLORES stated that CASTELLANO-QUINTANILLA offered to pay a month of GUARDADO FLORES' rent and to pay a tax that GUARDADO FLORES' owed on

his vehicle. GUARDADO FLORES stated that CASTELLANO-QUINTANILLA had told him that the packages (i.e., the ones later field-tested as positive for cocaine) were "money." GUARDADO FLORES understood this comment to mean that the packages contained cocaine which would be sold to generate money. GUARDADO FLORES also admitted he used cocaine. When confronted by law enforcement about his participation in drug trafficking, GUARDADO FLORES denied that he was actively involved in trafficking cocaine. Based on my training and experience, however, I know that individuals involved in illegal activity often attempt to minimize their participation when questioned by law enforcement. Further, I know that drug traffickers often enlist couriers to help drive or transport narcotics in exchange for payment in cash and/or a share of the controlled substances. Here, GUARDADO FLORES' description of his participation and anticipated payment connected to the subject trip to Texas, as well as his stated familiarity with cocaine, is consistent with the role of a drug courier.

15. GUARDADO FLORES admitted during his post-arrest interview that TARGET 3 CELL PHONE was his cellular device.

16. Law enforcement also interviewed PORTILLO AGUILAR. PORTILLO AGUILAR, who advised that she was in a romantic relationship with CASTELLANO-QUINTANILLA, admitted she traveled to Texas on multiple prior occasions with him and described the drug quantities purchased on their prior visits. When asked by law enforcement, PORTILLO AGUILAR stated that "Jayro" (i.e., CASTELLANO-QUINTANILLA) had purchased the cocaine in Texas that law enforcement recovered from the vehicle. I know from training and experience that drug traffickers often enlisted trusted individuals, such as family members, romantic partners, and/or close associates to help them transport, sell, or safeguard valuable contraband or the money derived from its sale. Here, PORTILLO AGUILAR conveyed

details of prior trips to Texas and possessed information regarding the seized narcotics is consistent with her involvement in drug trafficking with CASTELLANO-QUINTANILLA.

17. PORTILLO AGUILAR admitted during her post arrest interview that TARGET 2 CELL PHONE was her cellular device.

18. Law enforcement also interviewed CASTELLANO-QUINTANILLA. CASTELLANO-QUINTANILLA stated that there was an individual in Texas with whom he coordinated the trip and gave instructions about the cost of the cocaine CASTELLANO-QUINTANILLA purchased when in Texas. CASTELLANO-QUINTANILLA generally described how he would arrive at an initial meeting location somewhere in Texas and then he was transported by other individuals to an unknown location where he would obtain the narcotics. CASTELLANO-QUINTANILLA initially stated that the only item that belonged to him in the vehicle was marijuana, and subsequently admitted that all of the controlled substances that were seized from the vehicle were his possessions.

19. CASTELLANO-QUINTANILLA admitted during his post arrest interview that TARGET 1 CELL PHONE was his cellular device.

### Use of Cellular Devices in Relation to Drug Trafficking Activity

20. During the course of the investigation, law enforcement used legal process to obtain toll records, or records of calls or text messages, that occurred between the parties. Specifically, those records showed repeated contacts between CASTELLANO-QUINTANILLA and PORTILLO AGULIAR, and repeated contacts between CASTELLANO-QUINTANILLA and GUARDADO FLORES.

21. During the investigation, at the direction of law enforcement, the CS contacted CASTELLANO-QUINTANILLA using a cellular device and discussed drug trafficking activity.

Specifically, the CS discussed acquiring controlled substances from CASTELLANO-QUINTANILLA and used a cellular device to do so.

22. During the above-described interview with law enforcement, GUARDADO FLORES told investigators that he recorded a video on his phone of the kilograms of cocaine acquired in Texas later found in the vehicle. GUARDADO FLORES also told investigators his cellular device contained communications between GUARDADO FLORES and CASTELLANO-QUINTANILLA discussing drug trafficking activity, along with conversations with other individuals discussing drug trafficking activity.

23. I know through my training and experience that cellular devices contain historical information about the geo-location of the user. Importantly here, the statements and evidence suggest that CASTELLANO-QUINTANILLA, PORTILLO AGULIAR, and GUARDADO FLORES traveled to and from Texas to acquire narcotics and had done so on prior occasions. Information related to their location is likely present on the phone and relevant to this drug trafficking activity.

24. I know from training and experience that drug distributors often use cellular phones to arrange drug deals by using the calling feature, text message feature, or a communication-based application and as set forth above. An analysis of call patterns can identify other drug dealers. Photographs or videos found on cellular telephones often show contraband, or locations where contraband may be found. Contact numbers stored in cellular telephone(s) may identify other drug distributors or associates. All told, significant evidence of criminal activity can be found within cellular telephones found in the possession of a drug dealer.

**TECHNICAL TERMS**

25. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. *Wireless telephone:* A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. *Digital camera:* A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. *Portable media player:* A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

   d. *GPS:* A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an

9

  extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA:* A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. *Tablet:* A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. *Pager:* A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. *IP Address:* An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. *Internet:* The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet,

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26. Based on my training, experience, and research, I know that the device described in Attachment A has capabilities that allows it to serve as a wireless telephone, phone book, digital camera, digital recorder, GPS Navigation, portable media player, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is

evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it contains evidence described by the warrant.

30. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the device described in Attachment A, in order to seek the items described in Attachment B.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/Jenna Sullivan*
Jenna Sullivan, Task Force Officer

Drug Enforcement Administration

Received by reliable electronic means and sworn and attested to by telephone on this <u>6th</u> day of November 2023.

_____
JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

1. The property to be searched is as follows:

    a. Cellular phone marked as N-1 (TARGET 1 CELL PHONE) belongs to CASTELLANO-QUINTANILLA. The cellular device is an Apple iPhone green color

    b. Cellular phone marked as Item N-2 (TARGET 2 CELL PHONE) belongs to PORTILLO AGULIAR. The cellular device is an Apple iPhone purple in color.

    c. Cellular phone marked as N-3 (TARGET 3 CELL PHONE) belongs to GUARDADO FLORES. The cellular device is an Apple iPhone black in color.

## ATTACHMENT B

1. All records on the device described in Attachment A that relate to violations of 21 U.S.C. §§ 846 and 841(a)(1), and involves JAYRO CASTELLANO-QUINTANILLA (CASTELLANO-QUINTANILLA), DENIS GUARDADO FLORES (GUARDADO FLORES), and JOHANA PORTILLO AGUILAR (PORTILLO AGUILAR) since October 2022 to present, including:

   a. Any conversations, whether through text messages or other applications, concerning the distribution and/or possession with the intent to distribute controlled substances;

   b. Lists of customers and related identifying information;

   c. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   d. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   e. Any information relating to (including names, addresses, phone numbers, or any other identifying information) or communications with JAYRO CASTELLANO-QUINTANILLA (CASTELLANO-QUINTANILLA), DENIS GUARDADO FLORES (GUARDADO FLORES), and JOHANA PORTILLO AGUILAR (PORTILLO AGUILAR) co-conspirators or associates in drug distribution;

   f. Any information relating to the schedule or travel of JAYRO CASTELLANO-QUINTANILLA (CASTELLANO-QUINTANILLA), DENIS GUARDADO FLORES (GUARDADO FLORES), and JOHANA PORTILLO AGUILAR (PORTILLO AGUILAR) and his co-conspirators;

   g. All bank records, checks, credit card bills, account information, and other financial records;

   h. Photographs of drug associates, locations involved with drug dealing, drug storage locations, drug-related currency, or any other contraband; and

   i. Communications, by whatever means made, between JAYRO CASTELLANO-QUINTANILLA (CASTELLANO-QUINTANILLA), DENIS GUARDADO FLORES (GUARDADO FLORES), and JOHANA PORTILLO AGUILAR (PORTILLO AGUILAR) and persons with whom he was transacting illegal narcotics, discussing or arranging the transaction of illegal narcotics.

2.      Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted. Such evidence might include logs, phonebooks, saved usernames and passwords, documents, and browsing history.